UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JASON JOSEPH KRON                                CIVIL ACTION

VERSUS                                           NO. 11-2263

JAMES LEBLANC ET AL.                             SECTION "C" (2)

## REPORT AND RECOMMENDATION;
## ORDER AND REASONS ON MOTION TO AMEND

Plaintiff, Jason Joseph Kron, is currently incarcerated in the B.B. "Sixty" Rayburn

Correctional Center ("Rayburn"). He filed the instant complaint pro se and in forma

pauperis, pursuant to 42 U.S.C. § 1983, against the Secretary of the Louisiana

Department of Corrections ("DOC") James M. LeBlanc and 21 other defendants,[1] all of

whom are employees at Rayburn. Kron asserts numerous claims arising from two

incidents of allegedly excessive force against him by Rayburn officials on March 4 and

March 27, 2010; other officials' failure to protect him from the excessive force; false

disciplinary reports filed against him regarding those two incidents; inadequate

disciplinary proceedings; inadequate outdoors exercise; insufficient medical care; and

other actions relating to his administrative remedies procedure ("ARP") complaints about

the two incidents. He seeks injunctive relief and monetary damages. Complaint, Record

_____

[1]All claims against four (4) of the originally named defendants, Bruce Stewart, Jane Wheat, Leroy Graves and Beverly Kelly, were previously dismissed, Record Doc. No. 53, leaving only 18 remaining defendants.

Doc. No. 1; Amended Complaint, Record Doc. No. 14; Second Amended Complaint, Record Doc. No. 37.

On February 29, 2012, I conducted a telephone conference in this matter. Participating were plaintiff pro se and Phyllis Glazer and Michael Keller, counsel for defendants. Plaintiff was sworn and testified for all purposes permitted by Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985), and its progeny.

During the conference, Kron stated that he wanted to dismiss all of his claims against defendants Bruce Stewart, Darryl Mizell and Leroy Graves. He also asked to dismiss his claims against defendant Greta Smith arising solely out of the March 4, 2010, incident of allegedly excessive force. Plaintiff further requested to dismiss those claims against defendants Warden Robert Tanner, Assistant Warden Keith Bickham and Secretary LeBlanc that relate solely to his dismissed claims against defendants Stewart, Mizell, Graves and Smith.

After the hearing, in furtherance of the screening process required by 28 U.S.C. § 1915A, I ordered Kron to provide to the court and defense counsel a sworn statement regarding the punishment he received for having been found guilty of disciplinary violations at the allegedly deficient disciplinary hearings. I also ordered defense counsel to provide the court and plaintiff with verified copies of documents reflecting what punishment plaintiff received as a result of the subject disciplinary hearings. Record

Doc. No. 47. Kron timely provided a statement that, although excessively voluminous, verbose, repetitive and largely nonresponsive to my order, does contain the ordered information. Record Doc. No. 48. Defendants' counsel timely provided the requested records. Record Doc. No. 49.

On July 12, 2012, I ordered both sides to submit affidavits or other evidence establishing the date or dates on which Kron exhausted his ARP concerning his claims. Record Doc. No. 58. Both sides complied. Record Doc. Nos. 59, 60.

In addition, since the <u>Spears</u> hearing, Kron has filed a third motion to amend, in which he seeks to add Greta Smith as an additional defendant concerning his claim that he was denied adequate outdoor exercise. Record Doc. No. 54. That motion is also addressed below.

## **THE RECORD**

Kron's written submissions are so voluminous, verbose, repetitive and filled with extraneous material that they make it extremely difficult to ascertain exactly what claims he is trying to assert against which defendant(s). His <u>Spears</u> testimony confirmed and clarified most of his allegations. He confirmed that he asserts eight kinds of claims in this case relating to two (2) separate incidents of excessive force and failure to protect, false disciplinary reports, inadequate disciplinary proceedings, insufficient medical care,

retaliation for filing ARP complaints and lawsuits, and failure to provide adequate outdoor exercise.

Kron testified that he was incarcerated in Rayburn after being convicted of simple possession of drugs on a multiple offender bill in August 2005 and that he is serving an eight-year prison sentence.

Kron testified that his claims of excessive force arise from two separate incidents. First, he testified that, on March 4, 2010, defendants Sergeant David Alford and Lieutenant Ronnie Seal used excessive force against him while transporting him from the bullpen back to his cell in Sleet Unit and then yanking him through the bars of his cell. Second, Kron testified that, on March 27, 2010, defendants Alford and Sergeant Steve Price used excessive force against him when he left his cell to be shaved.

As to the March 4, 2010 incident, Kron stated that he was housed in a maximum custody area at that time because a guard had fabricated a report accusing him of trying to get an extra tray of food. According to Kron, at around 7:30 a.m. on that date, he was locked in a "bullpen," an exercise cage located outdoors in which maximum custody prisoners could have "yard time." Kron explained that he was being kept in the third pen, while prisoner Walter Cox was in the second pen and prisoner Robert Hudson was in the first pen. Kron described the bullpens as being about two feet apart from each other and individually caged to prevent prisoners from reaching their hands out to touch each other.

Kron testified that he was fully restrained inside the bullpen with handcuffs, leg shackles and a waist belt. He stated that, while in their separate bullpens, Hudson told Cox, Kron's friend, that Kron had "ratted Cox out" to correctional officers, prompting them to search Cox's cell. Kron claimed that Cox did not believe Hudson. He said that Hudson told him, "Watch out for that free bitch," in reference to Sergeant Greta Smith, who heard the comment. Kron stated that Sgt. Smith went inside Sleet Unit, where Kron alleged that Smith "sat there and made a bunch of lies" and told Seal that Kron "threatened to come out of [his] handcuffs to hurt one of the inmates" and "refused to obey her orders." Kron said that Sgt. Smith gave him no such orders before entering Sleet Unit. He stated that Smith "built up a plot, a scheme, against" him and was known for being "prejudiced against white folks."

According to Kron, at this point, Seal, Smith and Alford "all conspired together and planned to come out [to the bullpen] and use excessive force" against him. He testified that the officers approached him, and Smith opened the bullpen. Kron said that when he asked Seal where they were going because his time outdoors was not yet over, Seal responded, "'Look, you gonna step out now, or do I have to come in and drag your stupid ass out? Now step out of the bullpen now.'" Kron testified that he complied, and as he stepped out, Seal "grabbed [Kron's] right arm with both his hands . . . squeezed them hard . . . and inflicted pain on [his] arm underneath [his] armpits and lifted [his]

body upwards." He said that he told Seal that the officer was "not supposed to handle him like [that]" and to let him go, but Seal did not release him. Kron further testified that Alford then grabbed his left arm over his biceps and triceps, squeezing Kron's incision from a surgery performed just two weeks earlier. Kron explained that he twisted his arm out of Alford's grip and told him, "Don't grab my incision again like that. You're going to injure my surgery." He stated that Alford retaliated by intentionally grabbing his incision again and squeezing it "twice as hard," "busting open" his incision. Kron stated that Alford and Seal lifted his body by his arms so that only his toes could touch the ground, and forced him to walk about 140 feet to Sleet Unit. Kron testified that Alford and Seal treated him this way to "inflict pain intentionally out of retaliation for Greta Smith's false accusations against [him]."

Kron denied that he had refused to come out of the bullpen when first ordered to do so. He acknowledged that he was the one who spoke first when he saw the guards approaching and asked, "Where y'all bringing me?" Kron described Seal's demand for him to exit the bull pen as "put[ting] fear inside [him]," to which he complied.

Kron testified that, on the way back to Sleet Unit, Kron's shackles kept "ramming into [his] legs" and "cutting [his] legs up around [his] shin bone, . . . the back of [his] Achilles tendon heels [and his] ankle bones." He said that the shackles continued cutting him as the officers led him to the front of Sleet Unit. He testified that when he and the

guards reached his cell, Seal and Alford "dropped" him on the floor, and Seal left Kron with Alford. Kron stated that Alford removed his leg shackles and made him step into the cell. He said that after the cell door shut, Alford put his arms through the cell bars to remove Kron's leather waist belt, at which point Kron discovered that he had "about a three-inch hole on the side of [his] arm where [his] incision used to be." Kron described the leather waist belt as attached to his handcuffs, which were still on his wrists. He testified that he put his wrists through the tray hatch of his cell, and Alford began removing his right handcuff. He said that he told Alford, "Look, I'm letting you know right now that I'm filing a complaint against you for busting open my incision and using excessive force against me."

Kron testified that, in response to his statement that he was going to file a complaint against the guards, Alford and Seal again used excessive force. According to Kron, Alford slammed the right handcuff back onto Kron's wrist and said, "'Oh yeah, you stupid bitch,'" stepped back about two feet, and started yanking on Kron's waist belt, which was still attached to his handcuffs, "hard, like tug-of-war hard." Kron testified that Alford "yanked [him] all the way through the bars," slamming his shoulders, chin and biceps into the tray hatch "for like five minutes straight." Kron said that this continued for about five minutes, and he kept yelling, "Stop, you're hurting me," to

which Alford yelled, "'Stop resisting, you stupid bitch.'" Kron denied that he was resisting.

Kron further testified that, after a couple of minutes, Seal approached the cell again, grabbed the other end of his waist belt and also started yanking it. Kron said that he was bleeding from his wrists where the handcuffs were "tearing [his] skin and flesh." He said that when Seal began yelling, "'Stop resisting,'" he replied, "I'm not the one resisting. Y'all the ones who keep trying to get me through the bars. Stop! Why y'all doing this to me?"

Kron testified that Seal and Alford were pulling on his waist belt so hard that he was pinned against the bars and could not move. He said that Seal told him to stand back so that he could put the belt around his waist, and Kron replied, "Alright man, just stop hurting me." Kron said that he could not stand back because Alford was still applying too much pressure to the belt, so Kron told him, "I can't move until you let off on the pressure." Kron said that when he finally stood up and Seal put the belt around his waist, he pulled it so tight that it hurt his stomach. Kron said he could barely breathe. He testified that when Seal tried to buckle the belt, Kron turned about one-fourth of the way around and said, "Hold up, man– you're hurting my stomach. I can't breathe," and Seal replied, "'Stand back around, and shut the fuck up.'" Kron stated that at this point, Seal

yanked the belt even tighter and locked it in place. Kron said that he has ulcerative colitis, so "any kind of pressure . . . against [his] stomach causes pain."

Kron testified that, although he was "totally restrained," Seal and Alford then entered his cell and body-slammed him onto the floor, causing him to "slid[e] across the floor all the way to the wall on the other side [of the cell]." Kron stated that the officers told him to kneel and face the wall, but he was not able to do so because of his restraints. He said that, at this point, Alford grabbed the back of his shirt and yanked him up, then grabbed him by the head and slammed his left cheek into the wall. Kron testified that Alford then said, "I told you, stupid motherfucker, not to say a word and sit there and kneel and face the wall." Kron said that he did not respond, and that Seal and Alford then backed away from him. He stated that these officers made him kneel with his nose against the wall for several minutes.

In addition to his broken surgical incision, Kron described his injuries suffered in the March 4th incident as follows: He was in "tortuous pain" while defendants pulled his waist belt through the cell bars. The bars scratched his arms "from [his] elbows all the way up to [his] shoulders." He had a "laceration on [his] right elbow." The handcuffs tore "chunks of skin and flesh" off both of his wrists. His wrists became swollen. For two days after the incident, he was in so much pain that he could not sleep.

As to the second excessive force incident on March 27, 2010, Kron testified that, around 6:30 a.m., Alford removed him from his cell while he was fully restrained and escorted him to another area to be shaved. Kron explained that, because he was on "maximum custody extended lockdown level one," he had to be shaved by a barber once a week and was not allowed to have a razor to shave himself. When asked why he was on maximum lockdown, Kron replied that he had received too many disciplinary write-ups, which had accumulated and resulted in lockdown punishment. He explained that he had received more than 30 disciplinary write-ups during his imprisonment, but that those write-ups had nothing to do with this lawsuit.

Kron testified that when he reached the shaving area, inmate Walter Cox began cursing at him because "[Cox] thought [Kron] had interrupted his phone call a few days prior." Kron said he responded by saying, "Stop cursing me; stop disrespecting me." He emphasized that he was still totally restrained and that Cox continued cursing at him. He testified that Alford "got agitated" and said, "'Y'all both need to shut the fuck up now.'" Kron stated that he stopped talking, but Alford "grabbed [his] arm on the [surgical] incision, squeezed it hard, jerked [his] body forward," and said, "'You're going back to your damn cell now.'" Kron explained that he told Alford, "Hold up," pulled his arm out of Alford's grip and said, "You already busted my incision open – don't do it again." Kron testified that Alford then intentionally grabbed his incision again and squeezed it.

Kron said he yanked his arm away again, and warned Alford about his incision a second time. He testified that Alford knew that he had busted his incision open on March 4th because Kron had already filed a grievance against Alford. Kron further alleged that an officer ordinarily does not touch a prisoner as he escorts him somewhere and that prisoners are allowed to "walk freely."

According to Kron, Alford punched Kron in the eye with a closed fist, causing his head to "slam backwards about three feet." Kron stated that Alford grabbed him by the shoulders and slammed his head against the wall into the cell block control box and then body-slammed him onto the concrete. Kron said that Alford then "kneed [him] between [his] legs one time real hard," hurting his testicles and tail bone, and "kneed [him] two times in [his] rib cage." He said Alford started punching him in the back of his head with closed fists, ramming his head into the concrete and smearing his face across the concrete several times. Kron testified that Steve Price, another officer, then started grabbing his legs and twisting them "real violently into the leg shackles." Kron said he told them to stop, but they did not. He stated that the leg shackles began cutting into his skin from Price twisting his legs, and he tried to stretch his legs out to prevent the cutting, but Price was too strong.

As to his failure to protect claims, Kron testified that on March 4, 2010, defendant Major Mike Todd was deliberately indifferent to his oral reports of the officers'

excessive force. Kron testified that Todd was the head of the security team that responded to the emergency beeper on that date. Kron said that he showed Todd his injuries when Todd approached him after the excessive force incident, but that Todd did not help him. Kron stated that even though he told Todd that the belt was too tight around his waist and even though Todd witnessed his shallow breathing, Todd simply said, "'You're going to be all right in a little while,'" and walked away.

Kron testified that defendants Elizabeth Olivierra, Sergeant Larry Weary, and Wardens Tanner, Bickham and LeBlanc all also failed to protect him from the officers who used excessive force against him. Specifically, Kron testified that Elizabeth Olivierra failed to protect him on March 4, 2010, because she witnessed the officers exert excessive force against him and failed to intervene. He testified that Ronnie Seal failed to protect him from other officers using excessive force on March 4, 2010 because Seal failed to stop them from beating him, and instead participated in the excessive force. Plaintiff testified that Larry Weary failed to protect him from other officers using excessive force, because Weary watched the officers beat Kron on March 27, 2010 and failed to intervene. He said that Weary also helped the other officers cover up their use of excessive force.

As to Wardens Tanner and Bickham and Secretary LeBlanc, Kron alleged that their failure to protect him from other officers using excessive force occurred because,

as supervisors, they failed to remove Alford and Seal from the prison. Kron stated that the wardens knew that Alford and Seal had a history of beating inmates and using excessive force. Kron alleged that several inmates had filed excessive force complaints against Alford and Seal for the past five to ten years, including, for example, another Rayburn inmate named Tyrone Van Buren. Kron confirmed, however, that neither Tanner, Bickham nor LeBlanc were present during the alleged excessive force incidents on either March 4 or March 27, 2010.

As to his medical care claims, Kron testified that he received inadequate medical care from defendants Sergeant Bruce Forbes, Director of Nursing Bessie Carter, Dr. Dennis Laravia and Elizabeth Olivierra. Kron testified that Forbes, an emergency medical technician ("EMT") at the jail, refused to open plaintiff's cell to examine his injuries and gave him insufficient medical care. Kron also alleged that Forbes conspired with prison officials to cover up the excessive force incidents. Kron testified that Carter failed to provide him with a doctor and failed to discipline Forbes for his inaction. Kron testified that Dr. Laravia, "head of all medical," failed to review Kron's medical records and failed to examine his incision. Kron also testified that Olivierra, his social worker, failed to treat him for the mental anguish he suffered from the March 4th incident.

Kron testified that EMT Forbes responded to the March 4th excessive force incident. Kron stated that he showed Forbes the chunk of skin missing from his left

wrist, the laceration on his right wrist, the abrasions and swelling on both wrists and biceps, the laceration on his right elbow, the "busted open" incision on his left arm and the small abrasions on his legs. Kron stated that Forbes refused to take him out of his cell for treatment and only stuck his hands through the bars to treat his injuries. Kron confirmed the notation in his medical records that Forbes used hydrogen peroxide to clean his arms and provided him with three bandages – one for his right wrist, one for his left wrist and one for his surgical incision.

Kron testified that he told Forbes that he "needed something for [his] pain" and that his incision was hurting the most. He stated that Forbes did not give him anything and told him that his injuries were not bad enough to see a doctor. Plaintiff testified that he told Forbes that his incision needed to be stitched up and Forbes said he would see what he could do, but did nothing. When asked to confirm the medical records noting that Forbes provided antibiotic ointment when cleaning Kron's injuries, Kron replied that his copy of the medical records did not note the ointment, that Forbes never gave him any ointment and that Forbes never gave him a bandage with ointment on it. Kron confirmed the notation in his medical records that Forbes returned to his cell in approximately two hours, but he testified that Forbes merely took photographs of his injuries and "didn't clean [his] injuries or anything else" at that time.

Kron testified that Forbes's deliberate mistreatment of his medical conditions is evidenced by the fact that Forbes "conspired with David Alford, Ronnie Seal and Mike Todd" to help them "cover up the excessive force issue" by writing in his medical records that Kron tried to yank the officers through the bars. Kron said that this allegation cannot be true because no disciplinary report alleges that he attempted to do that to the officers. He stated that Forbes refused to let him document his injuries and in doing so, failed to document the abrasions on his biceps, the chunk of flesh and skin torn out of his left wrist and his open incision, all to help the officers cover up Kron's excessive force claim.

Kron testified that Bessie Carter, "director of medical at Rayburn," failed to respond to his written request for medical care. Kron claimed that on March 7 or 8, 2010, he wrote a letter telling Carter about Forbes's actions and requesting medical care, but that Carter failed to take any action. According to Kron, he wrote that Forbes forged his medical documents; accused him of trying to jerk the prison guards through the bars, which led to the struggle; failed to treat him; and did not document his injuries. Kron also testified that he requested that Carter "take any action necessary to discipline Forbes's conspiracy act and [his] medical document being falsified and fabricated." Kron also stated that he requested a doctor to re-stitch his incision. He testified that Carter did not respond to his letter or any of his requests. When asked if his incision ever

healed, Kron explained that it healed on its own about two weeks later, but that he had "to put tape on [his] arm to close it together to get it to heal."

Kron testified that Dr. Laravia, who is "in charge of all the medical," did not review his medical file to see if he had received proper medical care. He alleged that it is Dr. Laravia's responsibility to review all medical files. He also alleged that Dr. Laravia must have known from the language in the report that Kron's arm with the incision was injured because Dr. Laravia was the doctor who had performed the February 10, 2010, surgery that left the incision. Kron said that Dr. Laravia, despite his knowledge, still refused to see Kron to check his arm.

Kron also stated that Dr. Laravia did not provide him with any pain medication. While Kron confirmed the notation in his medical records that on March 31, 2010, he was given Asacol, he explained that it was treatment for his ulcerative colitis and not pain medication. Kron also confirmed the notation in his medical records that he was given Tylenol on April 4, 2010. When asked to confirm the indication in his medical records that Nurse Johnson gave him 500 milligrams of Tylenol on March 27, 2010, Kron replied that he was only given an ice pack for his eye during the day, but a night nurse responded to his sick call request that night and gave him a "whole bottle" of Tylenol.

Kron also testified that Elizabeth Olivierra, his social worker, failed to provide adequate care. Kron claimed that Olivierra knew about the officers' use of excessive

force because she witnessed them use force against him.  He testified that Olivierra knew that he had probably suffered emotional injuries, yet failed to provide him with services in her capacity as a social worker.  He explained that he suffered from mental anguish from the March 4 incident and needed to talk to someone and that she failed to talk to him.

Kron also claimed that he did not receive sufficient outdoor exercise because he was fully restrained during yard time.  He stated that Regional Warden Rader, Sergeant Smith, Secretary LeBlanc, Wardens Tanner and Bickham, Sergeants Weary and Simon, and Lieutenants Tullas and Seal implemented policies that prohibit inmates on level one maximum custody from exercising, unless they are in full restraints in the outdoors bullpen.  Kron alleged that the insufficient outdoor exercise has caused him health problems.

In addition, Kron alleged that several defendants filed false disciplinary reports against him and that he received inadequate disciplinary proceedings in the prison.  He testified that the false reports centered around his behavior on March 4, 2010, when he was removed from the bullpen and when the officers were allegedly pulling him through the bars.  Kron expanded upon these allegations in his extensive written submissions, in which he alleged that defendants Todd, Alford, Price and Weary conspired together to "falsify and fabricate their disciplinary reports against [him]."  Record Doc. No. 1 at 20,

¶ 26.  Kron alleged that defendants did this to "inflict further mental anguish and punishment," to "caus[e] [him] to be sentenced . . . to punitive segregation . . . to cover up their unlawful excessive force" and "to escape any legal consequences."  Record Doc. No. 1 at 20, ¶ 26.  Kron stated that he received the first two allegedly fabricated disciplinary reports March 4, 2010, and that they related to the March 4th excessive force incident.  He claimed that Alford "falsely alleged that the plaintiff violated" prison disciplinary rules prohibiting "defiance" and "aggravated disobedience."  Record Doc. No. 48 at 3, ¶ B.  Kron further alleged that "cell block officers discarded [his] copy of that disciplinary report without justification."  Record Doc. No. 48 at 3, ¶ B, and 4, ¶ C. He also asserted that Seal "falsely alleged that [he] violated" the defiance and aggravated disobedience rules.  Record Doc. No. 48 at 4, ¶ C.

Kron alleged that he received two more allegedly fabricated disciplinary reports on March 27, 2010, relating to the March 27th excessive force incident.  Record Doc. No. 48 at 5, 6, ¶ 3.  First, Kron claimed that Alford "falsely alleged that [he] violated" the defiance and disobedience rules.  Record Doc. No. 48 at 6, ¶ 4A.  Second, Kron claimed that Price "falsely alleged that the plaintiff violated" the same rules.  Record Doc. No. 48 at 8, ¶ C.  Kron alleged that cell block officers discarded both reports "when he was reassigned to extended lockdown."  Record Doc. No. 48 at 8, ¶ C.  In his second

amended complaint, Kron claimed that Smith, Todd, and Weary also fabricated and falsified disciplinary reports. Record Doc. No. 37 at 3, ¶ 11.

Kron testified that he received faulty disciplinary hearings on March 5 and March 29, 2010, concerning these false disciplinary writeups. When asked what was inadequate about the hearings, Kron responded that administrators refused to call his witnesses and failed to document that he had requested the witnesses. Kron confirmed that he had been given the opportunity to make a statement on his own behalf and that he had received a write-up setting out the charges against him, but he pointed out that his post-hearing finding of disciplinary violations did not include any reasons as to why he was found guilty.

In his voluminous written complaint, Kron alleged that Disciplinary Board Chairwoman Beverly Kelly found him guilty during the March 5th hearing of defiance and aggravated disobedience "without any evidence to support a guilty verdict." Record Doc. No. 1 at 16, ¶ 14. He also claimed that his punishment of "$34.00 in restitution" and "over 60 day [sic] of punitive segregation without sheets, [a] blanket, or a mattress all without due process" violated his "Fourteenth Amendment right" and was thus "illegal." Record Doc. No. 1 at 16, ¶ 14.

In response to my post-<u>Spears</u> hearing order that Kron provide a sworn statement describing the punishment he received as a result of the allegedly faulty disciplinary

hearings, Kron submitted an extensive but largely repetitive written response. He stated that, as a result of Alford's report, he received "a sentence of ten days in detention-isolation for the guilty verdict [of] . . . Defiance" and the same sentence for the guilty verdict of Aggravated Disobedience, to run consecutively, together with "$34.00 restitution." Record Doc. No. 48 at 3, ¶ B2; id. at 4, 5, ¶ C2. According to Kron's written response concerning punishment resulting from Alford's and Price's disciplinary reports, Record Doc. No. 48 at 6-8, the disciplinary board imposed "without the due process of law a sentence of ten days in detention-isolation for the guilty verdict" of defiance and "a sentence of a loss of four weeks of yard and recreation for the guilty verdict" of aggravated disobedience, to run consecutively, together with a $20.00 restitution charge. Record Doc. No. 48 at 6, 7, ¶ A2; at 8, ¶ B2. He wrote that Graves imposed the same sentence as a result of Price's report. Record Doc. No. 48 at 9, ¶ C2.

As to his final claim, Kron alleged that defendant Kelly violated his First Amendment rights when she attempted to cover up the other officers' use of excessive force by not allowing Kron to file ARP grievances documenting the officers' use of excessive force. He said that Kelly denied him access to the courts by refusing to allow him to file his ARP grievances appropriately. In his second amended complaint, Kron claimed that Kelly rejected his ARP complaints against Smith, Stewart, Mizell, Harrell

and Tanner because "they were repetitive" to another ARP grievance. Record Doc. No. 37 at 4, ¶ 16.

As to exhaustion of Kron's ARP concerning these claims, a requirement imposed in 42 U.S.C. § 1997e(a), the affidavits submitted by plaintiff and on behalf of defendants in response to my order establish the following dates regarding plaintiff's principal claims: (1) Kron's ARP grievance concerning the March 4, 2010 use of force by Seal and Alford was filed by plaintiff on March 8, 2010; received by defendants on March 10, 2010; and denied at the final step on July 21, 2010. (2) Kron's ARP grievance concerning various defendants' failure to protect him from the March 4th use of force was filed on April 19, 2010 and denied at the final stage on January 6, 2011. (3) Kron's ARP grievance concerning inadequate medical care was filed on June 23, 2010 and denied at the final step on May 20, 2011. (4) His excessive force and failure to protect claims arising from the March 27, 2010 incident were submitted to the ARP on April 5, 2010 and denied at the final stage on November 18, 2010. (5) Kron's ARP grievance concerning his outdoors exercise was filed on October 11, 2010 and denied at the final stage on August 15, 2011. Record Doc. No. 60 at ¶¶ 2, 9, 14, 15, 20, 21, 25, 28, 35, 38 and 42; Record Doc. No. 59-1 at ¶¶ 14, 16, 30, 31, 36 and 43.

# ANALYSIS

## I.     STANDARDS OF REVIEW

"A federal court may dismiss a claim in forma pauperis 'if satisfied that the action is frivolous or malicious.'"  Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994) (quoting former 28 U.S.C. § 1915(d), now incorporated in 28 U.S.C. § 1915(e), as amended); accord U.S. ex rel. Morgan v. Fuerzas Armadas Colombianas, No. 11-10911, 2012 WL 3493464, at *1 (5th Cir. Aug. 15, 2012) (citing 28 U.S.C. § 1915(e)(2)(B); Harris v. Hegmann, 198 F.3d 153, 156 (5th Cir. 1999)); Samford v. Dretke, 562 F.3d 674, 678 (5th Cir. 2009) (citing 28 U.S.C. §§ 1915(e)(2)(B)(i), (ii); Harris, 198 F.3d at 156).  A complaint is frivolous "'if it lacks any arguable basis in law or fact.'"  Id. (quoting Harris, 198 F.3d at 156); accord Davis v. Scott, 157 F.3d 1003, 1005 (5th Cir. 1998); Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994).  The law "'accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.'"  Macias v. Raul A. (Unknown), Badge No. 153, 23 F.3d 94, 97 (5th Cir. 1994) (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)); accord United States v. Ajaegbu, 165 F.3d 24, 1998 WL 870705, at *3 (5th Cir. Dec. 4, 1998) (quoting Neitzke, 490 U.S. at 327).

The purpose of a <u>Spears</u> hearing is to dig beneath the conclusional allegations of a pro se complaint, to ascertain exactly what the prisoner alleges occurred and the legal basis of the claims. <u>Spears</u>, 766 F.2d at 180. "[T]he <u>Spears</u> procedure affords the plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to many prisoners." <u>Davis</u>, 157 F.3d at 1005. The information elicited at such an evidentiary hearing is in the nature of an amended complaint or a more definite statement under Fed. R. Civ. P. 12(e). <u>Copeland v. Livingston</u>, 464 F. App'x 326, 328 n.1 (5th Cir. 2012) (citing <u>Eason v. Holt</u>, 73 F.3d 600, 602 (5th Cir. 1996)); <u>Haddix v. Kerss</u>, 203 F. App'x 551, 554 (5th Cir. 2006) (citing <u>Adams v. Hansen</u>, 906 F.2d 192, 194 (5th Cir. 1990)); <u>Wilson v. Barrientos</u>, 926 F.2d 480, 481 (5th Cir. 1991). "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists." <u>Spears</u>, 766 F.2d at 182.

The court may make only limited credibility determinations in a <u>Spears</u> hearing, <u>Norton v. Dimazana</u>, 122 F.3d 286, 292 (5th Cir. 1997) (citing <u>Cay v. Estelle</u>, 789 F.2d 318, 326-27 (5th Cir. 1986), <u>overruled on other grounds by Denton v. Hernandez</u>, 504 U.S. 25 (1992)), and may consider and rely upon documents as additional evidence, as long as they are properly identified, authentic and reliable. "The Court should allow proper cross-examination and should require that the parties properly identify and authenticate documents. A defendant may not use medical records to refute a plaintiff's

testimony at a <u>Spears</u> hearing." <u>Id.</u> (citing <u>Wilson</u>, 926 F.2d at 482-83; <u>Williams v. Luna</u>, 909 F.2d 121, 124 (5th Cir. 1990)).  However, "'[m]edical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference.'"  <u>Gobert v. Caldwell</u>, 463 F.3d 339, 347 n.24 (5th Cir. 2006) (quoting <u>Banuelos v. McFarland</u>, 41 F.3d 232, 235 (5th Cir. 1995)) (internal citations omitted).

After a <u>Spears</u> hearing, the complaint may be dismissed as legally frivolous if it lacks an arguable basis in law, <u>Mahogany v. Muwwakkil</u>, 259 F. App'x 681, 682 (5th Cir. 2007) (citing <u>Neitzke</u>, 490 U.S. at 325; <u>Jackson v. Vannoy</u>, 49 F.3d 175, 176-77 (5th Cir. 1995)); <u>Moore v. Mabus</u>, 976 F.2d 268, 269 (5th Cir. 1992), or "as factually frivolous only if the facts alleged are 'clearly baseless,' . . . [or] when the facts alleged rise to the level of the irrational or wholly incredible."  <u>Id.</u> at 270; <u>accord</u> <u>Flores v. U.S. Atty. Gen.</u>, 434 F. App'x 387, 2011 WL 3209869, at *1 (5th Cir. 2011)  (citing <u>Denton</u>, 504 U.S. at 32-33).

"'A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist.'"  <u>Davis</u>, 157 F.3d at 1005 (quoting <u>McCormick v. Stalder</u>, 105 F.3d 1059, 1061 (5th Cir. 1997)); <u>accord</u> <u>McClure v. Turner</u>, No. 11-40810, 2012 WL 2890911, at *3 (5th Cir. July 13, 2012) (citing <u>Geiger v. Jowers</u>, 404 F.3d 371, 373 (5th Cir. 2005)).  "When a complaint raises an arguable question of law which the district

court ultimately finds is correctly resolved against the plaintiff, dismissal under Rule 12(b)(6) is appropriate; however, dismissal under the section 1915(d) standard is not." Moore, 976 F.2d at 269; accord Alfred v. Corr. Corp., 437 F. App'x. 281, 284 (5th Cir. 2011) (citing Neitzke, 490 U.S. at 325). A prisoner's in forma pauperis complaint which fails to state a claim may be dismissed sua sponte at any time under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

In this case, some of plaintiff's claims may be dismissed under 28 U.S.C. § 1915(e) and 42 U.S.C. § 1997e(c)(1), either as frivolous because they lack an arguable basis in law or under Rule 12(b)(6) in light of his testimony explaining the factual basis of his claims, even under the broadest reading.[2] On the other hand, plaintiff's claims of excessive force arising from the second, March 27, 2010 incident and failure to protect him from harm in connection with both incidents cannot be dismissed at this time and require further proceedings.

## II.   PRESCRIPTION

Initially, it might appear that a lawsuit which was facially filed in September 2011 and which asserts claims based on incidents that occurred in March 2010 is barred by the applicable one-year statute of limitations, or the concept of "prescription" under

---

[2] The court must "liberally construe briefs of pro se litigants and apply less stringent standards to parties proceeding pro se than to parties represented by counsel," Smith v. Lonestar Constr., Inc., 452 F. App'x 475, 476 (5th Cir. 2011), cert. denied, 132 S. Ct. 1746 (2012) (quotation omitted); Moore, 30 F.3d at 620, and I have done so in this case.

analogous Louisiana law. In this case, however, rules applicable especially to prisoner complaints have the effect of extending the prescriptive period for all of plaintiff's claims, <u>except</u> his excessive force claims based on the March 4, 2010 incident, which, for reasons explained below, had prescribed before the instant lawsuit was filed.

The district court may raise the limitations issue sua sponte in a suit filed in forma pauperis under 28 U.S.C. § 1915. <u>Wilke v. Meyer</u>, 345 F. App'x 944, 945 (5th Cir. 2009); <u>Lopez-Vences v. Payne</u>, 74 F. App'x 398, 2003 WL 22047325, at *1 (5th Cir. 2003) (citing <u>Gartrell v. Gaylor</u>, 981 F2d 254, 256 (5th Cir. 1993)). "'Dismissal is appropriate if it is clear from the face of the complaint that the claims asserted are barred by the applicable statute of limitations.'" <u>Stanley v. Foster</u>, 464 F.3d 565, 568 (5th Cir. 2006) (quoting <u>Harris</u>, 198 F.3d at 156).

Although Section 1983 has no statute of limitations, the Louisiana prescription statute, Louisiana Civil Code article 3492, applies to suits brought in federal court under Section 1983.

> Because there is no federal statute of limitations for § 1983 claims, the district court looks for comparison to the forum state's statute of limitations for personal injury claims. In Louisiana, personal injury claims are governed by La. Civ. Code Art. 3492, which provides for a prescriptive period of one year from the date of injury or damage.

<u>Duplessis v. City of New Orleans</u>, No. 08-5149, 2009 WL 3460269, at *4 (E.D. La. Oct. 26, 2009) (McNamara, J.) (citing <u>Wallace v. Kato</u>, 549 U.S. 384, 387 (2007);

Wilson v. Garcia, 471 U.S. 261, 275 (1985); Jacobsen v. Osborne, 133 F.3d 315, 319 (5th Cir. 1998); Moore, 30 F.3d at 620; Elzy v. Roberson, 868 F.2d 793, 794 (5th Cir. 1989)); accord James v. Branch, No. 07-7614, 2009 WL 4723139, at *10 (E.D. La. Dec. 1, 2009) (Duval, J.) (citations omitted).

Federal law determines when a Section 1983 claim accrues. Jacobsen, 133 F.3d at 319.

> For purposes of calculating the limitations period, a § 1983 cause of action accrues when the plaintiff knows or has reason to know of the injury which forms the basis of his action. The Supreme Court has held that prescription begins to run at the point when "the plaintiff can file suit and obtain relief."

Duplessis, 2009 WL 3460269, at *5 (quoting Wallace, 549 U.S. at 388) (citing Jacobsen, 133 F.3d at 319; Gonzales v. Wyatt, 157 F.3d 1016, 1020 (5th Cir. 1998)); accord Dixon v. Cooper, 260 F. App'x 728, 729 (5th Cir. 2007); Piotrowski v. City of Houston, 51 F.3d 512, 516 (5th Cir. 1995). Determination of when plaintiff knew or should have known of the existence of a possible cause of action has two factors: "(1) [t]he existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions." Id.; accord Dixon, 260 F. App'x at 729. In the instant case, there is no question that Kron knew of the allegedly excessive force on March 4, 2010, when it occurred.

The date when the clerk of court receives the complaint, rather than the formal filing date, usually establishes the time of filing in forma pauperis complaints. Martin v. Demma, 831 F.2d 69, 71 (5th Cir. 1987). However, in the pro se prisoner context, a

"mailbox rule" applies, so that the date when prison officials receive the complaint from the prisoner for delivery to the court is considered the time of filing for limitations purposes. United States v. Petty, 530 F.3d 361, 363 & n.1 (5th Cir. 2008); Stevenson v. Anderson, 139 F. App'x 603, 604 (5th Cir. 2005); Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995).

In this case, the earliest date on which prison officials could have received Kron's complaint for delivery to this court is August 26, 2011, when he signed and dated his form complaint, its attachment and his pauper's affidavit. Complaint, Record Doc. No. 1 at pp. 6 and 34;[3] Record Doc. No. 2 at p. 2. Plaintiff's complaint is therefore considered filed and this action commenced on August 26, 2011 for limitations purposes under the mailbox rule.

In addition to applying the forum state's statute of limitations, federal courts should give effect to any applicable tolling provisions provided by state law. Lopez-Vences, 74 F. App'x at 398; Clifford v. Gibbs, 298 F.3d 328, 333 (5th Cir. 2002); Gartrell, 981 F.2d at 257. The running of prescription under Louisiana law may be suspended or tolled for equitable reasons, which have been expressed in the civilian legal principle of contra non valentem. Under this theory, there are four situations in which

---

[3]The complaint was tendered to the clerk of court for filing in this court on September 6, 2011 and was formally filed on September 15, 2011, after the court granted plaintiff's motion for leave to proceed in forma pauperis. Record Doc. Nos. 1, 2 and 3.

the one-year prescriptive period for delictual actions will not run: (1) if there was some legal cause that prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action, (2) if there was some condition coupled with the contract or connected proceeding that prevented the creditor from suing or acting, (3) if the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action, and (4) if the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant. Dominion Explor. & Prod. Inc. v. Waters, 972 So. 2d 350, 358 (La. App. 4th Cir. 2007) (citing Wimberly v. Gatch, 635 So. 2d 206, 211 (La. 1994); Plaquemines Parish Comm'n Council v. Delta Dev. Co., 502 So. 2d 1034, 1054-55 (La. 1987)). Thus, the "doctrine of contra non valentem recognizes that in limited circumstances prescription should not run if good cause exists as to why plaintiff would have been unable to exercise or was lulled into not exercising a cause of action when it first became exigible." Pracht v. City of Shreveport, 830 So. 2d 546, 551 (La. App. 2d Cir. 2002).

If a lawsuit asserting the same claim was previously timely filed in an appropriate court, the period during which the litigation was pending tolls, or interrupts, the running of the statute of limitations as to that claim.

> An interruption of prescription resulting from the filing of a suit in a competent court and in the proper venue or from service of process within the prescriptive period continues as long as the suit is pending. Interruption is considered never to have occurred if the plaintiff abandons, voluntarily

<u>dismisses the action at any time</u> either before the defendant has made any appearance of record or thereafter, or fails to prosecute the suit at the trial.

La. Civ. Code art. 3463 (emphasis added).

If "an interruption results and the action is dismissed without prejudice, the period during which the action was pending does not count toward the accrual of prescription. The plaintiff then has the full prescriptive period [after the dismissal] within which to bring a new action." <u>Id.</u> official comment (b) (citing <u>Hebert v. Cournoyer Oldsmobile-Cadillac-G.M.C., Inc.</u>, 405 So. 2d 359 (La. App. 4th Cir. 1981)); <u>accord</u> <u>Vincent v. A.C. & S., Inc.</u>, 833 F.2d 553, 555-56 (5th Cir. 1987); <u>Bank of N.Y. Mellon v. Smith</u>, 71 So. 3d 1034, 1050-51 (La. App. 3d Cir. 2011), <u>writ denied</u>, 75 So. 3d 462 (La. 2011).

Finally, where, as here, the plaintiff must exhaust an available ARP before filing suit, 42 U.S.C. § 1997e(a), the court must consider the time during which the prisoner's ARP was pending within the prison system when calculating the running of the limitations period. The pendency of a properly filed ARP grievance tolls the running of the one-year limitations period for a prisoner's claim. <u>Madis v. Edwards</u>, 347 F. App'x 106, 108 (5th Cir. 2009); <u>McBarron v. Fed. Bureau of Prisons</u>, 332 F. App'x 961, 964 (5th Cir. 2009); <u>Wright v. Hollingsworth</u>, 260 F.3d 357, 359 (5th Cir. 2001); <u>Harris</u>, 198 F.3d at 158-59.

Applying the foregoing standards, I find that Kron had properly filed ARP grievances, which suspended the running of the one-year limitations period in such a way as to render his complaint timely as to all of the claims in this case, except as to his excessive force claims against defendants Seal and Alford based on the March 4, 2010 incident. Under the liberal "mailbox rule," Kron's complaint is deemed filed in this court on August 26, 2011. Plaintiff had a pending ARP as to all of his claims, other than the excessive force claims arising out of the March 4th incident, which continuously interrupted[4] the running of the limitations period until each ARP was denied at the final step. When each ARP was finalized, the one-year limitations period on the claims encompassed by that ARP began to run anew, pursuant to Louisiana law, and did not expire before August 26, 2011. See, e.g., March 4, 2010 failure to protect claims tolled during ARP No. RCC-2010-150 from April 19, 2010 to January 6, 2011; medical care claims tolled during ARP No. 2010-265 from June 23, 2010 to May 20, 2011; March 27, 2010 excessive force and failure to protect claims tolled during ARP No. RCC-210-128 from April 5, 2010 to November 18, 2010.

---

[4]"According to Louisiana decisions, after being interrupted by the filing of suit in a competent court, prescription is suspended while the suit is pending. However, it is preferable to speak of a continuous interruption rather than a suspension." La. Civ. Code art. 3463 official comment (b) (citing Hebert, 405 So. 2d at 359; Marshall v. So. Farm Bureau Cas. Co., 204 So. 2d 665 (La. App. 3d Cir. 1967); Dainow, The Work of the Louisiana Appellate Courts for the 1967-1968 Term, 29 La. L. Rev. 230 (1969)) (emphasis in original).

As to Kron's excessive force claims against Seal and Alford based on the March 4, 2010 incident, the one-year prescriptive period was tolled from March 8 through July 21, 2010, while the relevant ARP was pending. Harris, 198 F.3d at 158-59. Prescription then began to run anew as to these claims and Kron had one year, or until July 21, 2011, to file a lawsuit concerning his excessive force claims. Because the instant lawsuit was filed more than one month after that deadline expired, it is untimely as to those claims, unless the prescriptive period was tolled for another reason so as to extend the limitations period until at least August 26, 2011.

The only possible reason for such additional tolling would be the existence of a prior lawsuit. In February 2010, before any of the incidents at issue in the instant lawsuit occurred, Kron filed a lawsuit in this court, in which he alleged civil rights claims against three defendants, Tanner, Laravia and LeBlanc, arising out of events at Rayburn that predated and are unrelated to the events at issue in the current lawsuit. Civil Action No. 10-518 "F"(3), Kron v. Tanner et al., Record Doc. No. 1. On March 31, 2010, Kron amended his complaint in that prior lawsuit to add excessive force claims against new defendants Seal and Alford, based on the same March 4th incident as in the instant action. C.A. No. 10-518, Record Doc. No. 16 at pp. 8-9. Kron's excessive force claims against Seal and Alford were pending in C.A. No. 10-518 until final judgment was

entered dismissing the claims with<u>out</u> prejudice on August 31, 2010.[5] C.A. No. 10-518,

Record Doc. No. 40. The judgment of dismissal without prejudice was the result of the

court's grant of Kron's motions for <u>voluntary</u> dismissal of his excessive force claims

against Seal and Alford, so that he might pursue his ARP regarding those claims. C.A.

No. 10-518"F"(3), Record Doc. Nos. 33, 35, 36, 37.

Under the first sentence of Louisiana Civil Code article 3463, Kron's previous

lawsuit interrupted the running of prescription on his excessive force claims against Seal

and Alford from the date the two defendants were added to the suit until final judgment

of dismissal was entered on August 31, 2010. <u>Bank of N.Y. Mellon</u>, 71 So. 3d at 1050

(citing La. Civ. Code art. 3463; <u>Dark v. Marshall</u>, 945 So. 2d 246, 250 (La. App. 3d Cir.

2006)).

However, the second sentence of article 3463 provides that the interruption of

prescription "is considered <u>never to have occurred</u> if the plaintiff . . . voluntarily

dismisses the action at any time." La. Civ. Code art. 3463 (emphasis added); <u>accord</u>

<u>Bank of N.Y. Mellon</u>, 71 So. 3d at 1050 (citing La. Civ. Code art. 3463; <u>Batson v.</u>

<u>Cherokee Beach & Campgrounds, Inc.</u>, 530 So. 2d 1128, 1130 (La. 1988)); <u>see also</u>

<u>Vincent</u>, 833 F.2d at 555 (Voluntary dismissal, as used in article 3463, of a federal

---

[5]Although Kron filed a notice of appeal, and his appeal was pending for another three (3) months before it was dismissed for want of prosecution, the record is clear that he attempted to appeal only <u>other</u> claims that had been dismissed <u>with</u> prejudice, and <u>not</u> the excessive force claims that had been dismissed with<u>out</u> prejudice. C.A. No. 10-518"F"(3), Record Doc. Nos. 38, 40, 42.

lawsuit refers to "dismissal by stipulation of plaintiff" and "dismissals made at the plaintiff's request" or "instigated" by plaintiff.  If the district court's order of dismissal without prejudice "was a 'voluntary dismissal' within the meaning of La. [Civil Code] art. 3463, then it erased the interruption of prescription.").  Thus, prescription begins to run anew only "upon an <u>involuntary</u> dismissal without prejudice." <u>Bank of N.Y. Mellon</u>, 71 So. 3d at 1050 (citing <u>Batson</u>, 530 So. 2d at 1128) (emphasis added).

The Fifth Circuit has held that a plaintiff's voluntary dismissal without prejudice of a lawsuit brought under 42 U.S.C. § 1981, which is a civil rights statute that incorporates the one-year prescriptive period of Louisiana Civil Code article 3492 in the same manner as does 42 U.S.C. § 1983, did not toll prescription.  <u>Taylor v. Bunge Corp.</u>, 775 F.2d 617, 619 (5th Cir. 1985).  Although the court did not cite Louisiana Civil Code article 3463, it held that "the effect of such a dismissal was to put the plaintiff in the same legal position in which he would have been had he never brought the first suit.  The prescriptive period, therefore, is not tolled by the bringing of an action that is later voluntarily dismissed."  <u>Id.</u> (citations and footnotes omitted).

Kron's <u>voluntary</u> dismissal of his March 4, 2010 excessive force claims, which resulted in the final judgment of dismissal without prejudice in C.A. No. 10-518, "placed [him] in the position as if his claim had never been filed against" defendants Seal and Alford in that action, so that his renewed assertion of those claims in the instant lawsuit

"beyond the one-year mark was clearly outside the prescriptive period." Manning v. PFG-Caro Foods, 71 So. 3d 981, 996 (La. App. 5th Cir. 2011).

The legal effect of Kron's voluntary dismissal was that prescription on his excessive force claims arising out of the March 4, 2010 incident was never interrupted by bringing those claims in C.A. No. 10-518, and prescription did not begin to run anew upon entry of judgment without prejudice in that action. Kron's filing of the excessive force claims in the instant case on August 26, 2011, more than one year after the final denial of his ARP on July 21, 2010, was therefore untimely.

In sum, plaintiff's pending ARP grievances tolled the one-year limitations period as to each of his claims until final denial of the ARP less than one year before he filed the instant lawsuit, so that his claims are not time-barred, except as to his excessive force claims against Seal and Alford arising out of the March 4, 2010 incident. Those excessive force claims are time-barred and must be dismissed.

III.    EXCESSIVE FORCE

Kron was a convicted prisoner at the time of the March 4 and 27, 2010 incidents about which he complains. The United States Supreme Court has "held that 'the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury.'" Wilkins v. Gaddy, 130 S. Ct.

1175, 1176 (2010) (quoting Hudson v. McMillian, 503 U.S. 1, 4 (1992)).  The Supreme

Court confirmed that the standards it had established in Hudson remain the law.

> The "core judicial inquiry," we held [in Hudson], was not whether a certain
> quantum of injury was sustained, but rather "whether force was applied in
> a good-faith effort to maintain or restore discipline, or maliciously and
> sadistically to cause harm."  503 U.S. at 7, 112 S. Ct. 995; see also Whitley
> v. Albers, 475 U.S. 312, 319-321, 106 S. Ct. 1078, 89 L. Ed.2d 251 (1986).
> "When prison officials maliciously and sadistically use force to cause
> harm," the Court recognized, "contemporary standards of decency always
> are violated . . . whether or not significant injury is evident. . . ."  Hudson,
> 503 U.S. at 9 . . . .
>
> . . . . As we stated in Hudson, not "every malevolent touch by a
> prison guard gives rise to a federal cause of action."  503 U.S. at 9, 112 S.
> Ct. 995.  "The Eighth Amendment's prohibition of 'cruel and unusual'
> punishments necessarily excludes from constitutional recognition de
> minimis uses of physical force, provided that the use of force is not of a
> sort repugnant to the conscience of mankind."  Ibid. (some internal
> quotation marks omitted).  An inmate who complains of a "push or shove"
> that causes no discernible injury almost certainly fails to state a valid
> excessive force claim.  Ibid. (quoting Johnson v. Glick, 481 F.2d 1028,
> 1033 (2d Cir. 1973)).

Id. at 1178.

Kron's factual allegations must be accepted as true for present screening purposes.

His written submissions include allegations that he was beaten by Alford and Price on

March 27, 2010, even after he was restrained, at times when he offered no resistance.

Plaintiff  adequately states a claim for the unconstitutional use of excessive force.  See

Fennell v. Quintela, 393 F. App'x 150, 152, 155 (5th Cir. 2010) (Plaintiff alleged that

prison officer ordered him "to place his arms through the shower stall's food tray slot so

that she could remove his handcuffs. Officer Lopez-Lopez, however, did not simply remove Fennell's handcuffs; instead, she grabbed his wrists and twisted them." "If proven, [plaintiff's] version of events . . . would allow a reasonable jury to find that [the officer] used excessive force in violation of the Constitution."); Watts v. Smart, 328 F. App'x 291, 292, 293-94 (5th Cir. 2009) (prisoner's evidence that defendants struck him without provocation while he was in restraints "gives rise to genuine fact issues as to whether the force Sergeant Smith and Officer Meyer applied was excessive and whether their conduct was objectively reasonable."); Morris v. Trevino, 301 F. App'x 310, 313 (5th Cir. 2008) (Prisoner alleged that officer "twisted his arms into painful positions while his hands were handcuffed behind his back, yanked his hands through the tray slot opening of his cell, beat and punched on his arms, and punched him in the face." "[T]aking Morris's allegations as true, the force exerted by [defendant] was disproportionate to the amount of force necessary to maintain or restore order because the assault was, according to Morris, unprovoked.").

Under these circumstances, it cannot be concluded at this time that Kron's non-prescribed excessive force claims against Alford and Price arising from the March 27, 2010 incident are legally frivolous or fail to state a claim upon which relief may be granted. I recommend that further proceedings must be conducted as to these claims.

IV.    FAILURE TO PROTECT

Kron alleges that defendants failed to protect him from harm.  Specifically, he alleges that defendants Smith, Todd and Olivierra either instigated or stood by and did nothing while Seal and Alford beat him on March 4, 2010.  He makes similar allegations concerning defendant Weary as to the March 27, 2010 incident.  He also claims that defendants Tanner, Bickham and LeBlanc failed to protect him because, as supervisors, they failed to remove Alford and Seal from Rayburn, even though Alford and Seal have a history of excessive force complaints against them.

Kron was a convicted inmate at the time of the events on which he bases his claims, so that the Eighth Amendment standard applies.  Under the Eighth Amendment, prison officials have a duty to protect inmates from harm and to take reasonable measures to protect their safety.  Farmer v. Brennan, 511 U.S. 825, 832-33 (1994); Hare v. City of Corinth, 74 F.3d 633, 650 (5th Cir. 1996).  Prison officials can be held liable for their failure to protect an inmate only when they are deliberately indifferent to a substantial risk of serious harm.  Farmer, 511 U.S. at 834; Newton v. Black, 133 F.3d 301, 308 (5th Cir. 1998).

Only deliberate indifference, "an unnecessary and wanton infliction of pain or acts repugnant to the conscience of mankind," constitutes conduct proscribed by the Eighth Amendment.  Estelle v. Gamble, 429 U.S. 97, 105-06 (1976); accord Gregg v. Georgia,

428 U.S. 153, 182-83 (1976). "Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer, 511 U.S. at 847.

An inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment. "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." Id. at 834 (quotation omitted).

Further, plaintiff must establish that the defendant possessed a culpable state of mind. Id. (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)). A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. "Mere negligence or a failure to act reasonably is not enough. The officer must have the subjective intent to cause harm." Mace v. City of Palestine, 333 F.3d 621, 626 (5th Cir. 2003). If the court finds that one of the components of the test is not met, it need not address the other component. Davis, 157 F.3d at 1005.

> The Supreme Court has recently reaffirmed that "deliberate indifference" is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. The deliberate indifference standard permits courts to separate omissions that "amount to

> an intentional choice" from those that are merely "unintentionally negligent oversight[s]."

Southard v. Tex. Bd. of Crim. Justice, 114 F.3d 539, 551 (5th Cir. 1997) (citing Bd. of County Comm'rs v. Brown, 520 U.S. 397, 410 (1997)) (additional citations and footnote omitted) (emphasis added). "'Subjective recklessness,'" as used in the criminal law, is the appropriate test for deliberate indifference." Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997). Whether a prison official had the requisite knowledge of a substantial risk is a question of fact. Farmer, 511 U.S. at 837; Newton, 133 F.3d at 308.

> [If a] plaintiff presents evidence showing that a substantial risk of . . . attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus "must have known" about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

Farmer, 511 U.S. at 842-43. Thus, in Adames v. Perez, 331 F.3d 508 (5th Cir. 2003), the Fifth Circuit vacated and remanded a jury verdict in favor of an inmate, holding that evidence of isolated previous attacks was insufficient to show deliberate indifference to an inmate's safety or to support a jury's verdict that prison officials failed to protect the inmate.

In this case, accepting Kron's allegations as true at this time, I cannot conclude that his failure to protect claims against Smith, Todd, Olivierra and Weary are legally frivolous or fail to state a cause of action. His allegations that these defendants were

either directly complicit in or stood by and did nothing in the presence of those uses of force are sufficient to require further proceedings.

On the other hand, it cannot be concluded that Tanner, Bickham and LeBlanc, who were <u>not</u> present for or otherwise directly involved in the alleged attacks, unconstitutionally exposed plaintiff to a <u>substantial</u> risk of <u>serious</u> harm in their capacity as Rayburn supervisors. The supervisors' alleged knowledge of past excessive force complaints by prisoners is insufficient to meet the deliberate indifference standard. Their knowledge of prior incidents involving Seal and Alford, as alleged by Kron, was no more than the kind of evidence found <u>in</u>sufficient by the Fifth Circuit in <u>Adames</u> to show deliberate indifference to any known or anticipated threat to plaintiff.

Under these circumstances, it cannot be said that Tanner, Bickham and LeBlanc knew of and disregarded an excessive risk to Kron's health or safety. Plaintiff's testimony in this regard, even if accepted as true in its entirety for present purposes, does not rise to the level of deliberate indifference to a known risk of substantial harm required to establish a constitutional violation. <u>See</u> <u>Payne v. Parnell</u>, 246 F. App'x 884, 890 (5th Cir. 2007) (inmate had <u>no</u> failure to protect claim against prison officers who were unaware of any substantial risk posed prior to incidents in question); <u>McCullough v. Quarterman</u>, No. H-06-3974, 2008 WL 5061512, at *12 (S.D. Tex. 2008) (failure to

protect claim dismissed where inmate had received no threat and did not assert a need for protection before the subject incident).

For the foregoing reasons, plaintiff's Section 1983 claims of failure to protect from harm against Tanner, Bickham and LeBlanc should be dismissed for failure to state a claim upon which relief can be granted. However, his failure to protect claims against Smith, Todd, Olivierra and Weary must be the subject of further proceedings.

V.     MEDICAL CARE

Kron testified that he was not provided with adequate medical care for the injuries he suffered in the two March 2010 incidents of excessive force. He asserts these claims against defendants Dr. Dennis Laravia, Nursing Director Bessie Carter, EMT Bruce Forbes and social worker Elizabeth Olivierra.

Kron testified that he was a convicted prisoner at all times during which defendants allegedly failed to provide him with adequate medical care. In Estelle, 429 U.S. at 104, the Supreme Court held that a convicted prisoner may succeed on a claim for damages under 42 U.S.C. § 1983 for inadequate medical care only if he demonstrates that there has been "deliberate indifference to serious medical needs" by prison officials or other state actors. The same standards concerning deliberate indifference discussed above in connection with plaintiff's failure to protect claim also apply to this claim.

Thus, as detailed above, "deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer, 511 U.S. at 847. "[T]he deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." Id. at 834 (quotation omitted). A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. "Mere negligence . . . is not enough." Mace, 333 at 626. "'Subjective recklessness,' as used in the criminal law, is the appropriate test for deliberate indifference." Norton, 122 F.3d at 291.

In this case, Kron's allegations negate any inference that defendants acted with deliberate indifference in connection with his medical case. Kron's testimony and the verified medical records establish that jail personnel were not deliberately indifferent to his serious medical needs in the constitutional sense.

First, it cannot be concluded that any of the injuries Kron claims were incurred in the two March 2010 incidents constituted serious medical needs. Kron's testimony establishes that he suffered abrasions, bruises, mental anguish, swelling, lacerations and

a reopened surgical incision that healed on its own within two weeks. Plaintiff did not suffer "a life-long handicap or permanent loss" of the type required to constitute a serious medical need for constitutional purposes. See Hill v. Dekalb Reg'l Youth Detention Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994), overruled in part on other grounds by Hope v. Peltzer, 536 U.S. 730, 739 (2002) (citing Monmouth County v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (medical need is serious when it "results in an inmate's suffering 'a life-long handicap or permanent loss'")); Dickson v. Colman, 569 F.2d 1310, 1311 (5th Cir. 1978) (no serious medical need was demonstrated when plaintiff's high blood pressure presented no "true danger" or "serious threat" to his health). None of Kron's injuries rise to the level of serious medical needs for constitutional purposes. See, e.g., Lockett v. Suardini, 526 F.3d 866, 877 (6th Cir. 2008) ("minor lacerations and cuts" and soreness in two fingers, which were no longer obvious upon medical examination within 24 hours after altercation, were not serious medical needs); Vaughn v. City of Lebanon, 18 F. App'x 252, 274-75 (6th Cir. 2001) (no serious medical need when treating physicians analogized plaintiff's pepper-spray-related symptoms to a case of poison ivy and when his cuts, bruises and abrasions from struggle were visible but not permanent); Dawes v. Coughlin, 159 F.3d 1346, 1998 WL 513944, at *1 (2d Cir. 1998) (small laceration not a serious medical need); Davis v. Jones, 936 F.2d 971, 972-73 (7th Cir. 1991) (one-inch laceration not serious medical need); Benitez v. Locastro, No. 9:04-CV-

423, 2010 WL 419999, at *7 (N.D.N.Y. Jan. 29, 2010) (bruises and a laceration not serious medical conditions); <u>Willacy v. County of Brevard</u>, No. 04-cv-1666-Orl-18DAB, 2007 WL 1017657, at *9 (M.D. Fla. Mar. 30, 2007) (inmate who alleged that he suffered numerous lacerations, contusions, bruising and burning sensation in his eyes after being attacked by another inmate, but did not seek further medical assistance after his wounds were cleaned, failed to assert a serious medical need).

Second, Kron has alleged facts, confirmed by his testimony and his medical records, that negate any inference of deliberate indifference to his injuries by jail officials. Kron was seen on several occasions by various medical care providers, including a doctor, an emergency medical technician and nurses, concerning the injuries he suffered. He was provided with bandaging, medication including Tylenol, an ice pack, an eye examination and medical attention commensurate with the extent of his injuries. His reopened incision healed on its own within two weeks.

Under these circumstances, it cannot be inferred that jail personnel were deliberately indifferent in any way to plaintiff's condition. While it is clear from his allegations and testimony that Kron is not satisfied with the extent or nature of his medical care, including Dr. Lavaria's alleged failure to review his medical records or stitch his reopened incision and Olivierra's alleged failure to address his mental anguish, no finding of deliberate indifference can be made based on this record.

> [T]he decision whether to provide additional treatment is a classic example of a matter for <u>medical judgment</u>. A showing of deliberate indifference requires the prisoner to submit evidence that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. Deliberate indifference is an extremely high standard to meet.

<u>Gobert</u>, 463 F.3d at 346 (footnotes, citations and internal quotations omitted) (emphasis added). No such showing has been made on the current record. The decisions made by the treating medical providers to render the care that they gave, rather than more specialized care, are classic examples of the exercise of "medical judgment," which, even if incorrect, cannot serve as the basis for a finding of deliberate indifference in the constitutional sense.

Contentions like Kron's that amount to a disagreement with the speed, quality or extent of medical treatment or even negligence do not give rise to a Section 1983 claim. "[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not." <u>Stewart v. Murphy</u>, 174 F.3d 530, 534 (5th Cir. 1999) (citation omitted); <u>see id.</u> (active treatment of prisoner's serious medical condition that ultimately resulted in death does <u>not</u> constitute deliberate indifference, even if treatment was negligently administered); <u>Rowe v. Norris</u>, 198 F. App'x 579, 581 (8th Cir. 2006) (no constitutional violation when inmate disagreed with physician's choice of medication); <u>see also</u> <u>Estelle</u>, 429 U.S. at 107 (The "question

whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice . . . ."); Corte v. Schaffer, 24 F.3d 237, 1994 WL 242793, at *1 (5th Cir. 1994) (Contrary to plaintiff's allegation that he had received "no treatment" because he believed he needed a referral to a specialist, he failed to demonstrate deliberate indifference when he was seen by prison medical personnel with results being within a normal range.); Marksberry v. O'Dea, 173 F.3d 855, 1999 WL 98533, at *2 (6th Cir. Jan. 28, 1999) (plaintiff who alleged inadequate treatment for broken hand failed to state constitutional violation, when he was examined by physician and received x-rays and medication); Mendoza v. Lynaugh, 989 F.2d 191, 193 (5th Cir. 1993) (prisoner's disagreement with the type or timing of medical services provided cannot support a Section 1983 claim); Varnado v. Lynaugh, 920 F.2d 320, 321 (5th Cir. 1991) (plaintiff, who was 18 months post-surgical implantation of hip prosthesis, who complained of pain in his hip and who was ultimately diagnosed with broken wires in the prosthesis, failed to state a claim for deliberate indifference when he was seen by medical personnel "numerous times for problems relating to his hip."); Wesson v. Oglesby, 910 F.2d 278, 284 (5th Cir. 1990) (allegations establishing provision of medical treatment are inconsistent with inference of deliberate indifference).

Plaintiff's complaints in this case about his medical care for the minor injuries he suffered in the March 2010 incidents fail to state a claim of violation of his constitutional rights sufficient to obtain relief under Section 1983 because he cannot establish deliberate indifference to serious medical needs under the applicable constitutional standard. His medical care claims must therefore be dismissed.

VI.    <u>OUTDOOR EXERCISE</u>

Kron alleges that he has not received sufficient outdoor exercise or fresh air during his imprisonment in Rayburn. He complains that he was taken outside for exercise only in full restraints and was kept in a pen during his outdoors time because of his custodial status as a multiple disciplinary-rule violator.

The Fifth Circuit "has held that deprivation of exercise may constitute an impairment of health, which is actionable under the Eighth Amendment, and that the absence of outdoor exercise opportunities may constitute an Eighth Amendment violation." <u>Hewitt v. Henderson</u>, 271 F. App'x 426, 428 (5th Cir. 2008) (citations omitted). "While neither the Fifth Circuit nor the United States Supreme Court has ever specifically held that inmates enjoy an <u>absolute</u> right to out-of-cell exercise, the Fifth Circuit has repeatedly held that an extended deprivation of exercise opportunities <u>might</u> impinge upon an inmate's Eighth Amendment rights depending upon the particular facts of a given case." <u>Doolittle v. Holmes</u>, No. 06-986-C, 2010 WL 22552, at *4 (M.D. La.

Jan. 4, 2010) (citing <u>Hewitt</u>, 271 F. App'x at 428; <u>Green v. Ferrell</u>, 801 F.2d 765 (5th Cir. 1986); <u>McGruder v. Phelps</u>, 609 F.2d 1023 (5th Cir. 1979)) (emphasis in original).

However, it is clear that inmates have no protected liberty interest in specific recreational opportunities and the "[d]eprivation of exercise is not a <u>per se</u> constitutional violation." <u>Lewis v. Smith</u>, 277 F.3d 1373, 2001 WL 1485821, at *1 (5th Cir. 2001) (citing <u>Stewart v. Winter</u>, 669 F.2d 328, 336 n.19 (5th Cir. 1982); <u>Miller v. Carson</u>, 563 F.2d 741, 751 n.12 (5th Cir. 1977)); <u>accord</u> <u>Sampson v. Corrs. Corp.</u>, No. 08-CV-0915, 2009 WL 837640, at *16 (W.D. La. Mar. 26, 2009) (citing <u>Smith v. Boyd</u>, 945 F.2d 1041, 1043 (8th Cir. 1991); <u>Lato v. Attorney Gen.</u>, 773 F. Supp. 973, 978 (W.D. Tex. 1991) (citing <u>Beck v. Lynaugh</u>, 842 F.2d 757, 762 (5th Cir. 1988)). To succeed on a claim under Section 1983 for lack of exercise, a prisoner must establish "the existence of any health hazard under the specific circumstances involved." <u>Ruiz v. Estelle</u>, 679 F.2d 1115, 1152 (5th Cir.), <u>amended in part, vacated in part on other grounds</u>, 688 F.2d 266 (5th Cir. 1982); <u>accord</u> <u>Delaney v. DeTella</u>, 256 F.3d 679, 684 (7th Cir. 2001); <u>Green v. Ferrell</u>, 801 F.2d 765, 771 (5th Cir. 1986).

Plaintiff must also allege an actual injury <u>caused</u> by defendants' acts. <u>See</u> <u>Winding v. Sparkman</u>, 423 F. App'x 473, 474 (5th Cir. 2011) (citing <u>Jones v. Greninger</u>, 188 F.3d 322, 326 (5th Cir. 1999)) (failure-to-protect claim that does not allege any resulting injury does not state an Eighth Amendment violation); <u>Lawson v. Stevens</u>, 62

F.3d 394, 1995 WL 450100, at *1 (5th Cir. 1995) (citing <u>Knight v. Caldwell</u>, 970 F.2d 1430, 1432 (5th Cir. 1992)) (prisoner who "concedes that he was not harmed by the leg irons" with which he was shackled failed to state Eighth Amendment violation); <u>Jackson v. Culbertson</u>, 984 F.2d 699, 700 (5th Cir. 1993) (excessive force claim dismissed as frivolous when prisoner suffered no injury); <u>Oliver v. Collins</u>, 904 F.2d 278, 281 (5th Cir. 1990) (dismissal was proper when plaintiff alleged insufficient causal connection between defendants' conduct and the claimed assault, and plaintiff did not allege constitutional harm); <u>Auster Oil & Gas, Inc. v. Stream</u>, 835 F.2d 597, 602 (5th Cir. 1988) (Section 1983 is designed to compensate persons for actual injuries caused by deprivation of constitutional rights); <u>Jefferson v. City of Hazelhurst</u>, 936 F. Supp. 382, 386 (S.D. Miss. 1995) ("To state a cause of action under Title 42 U.S.C. § 1983, the plaintiff must plead . . . that there exists a direct causal connection, . . . without intervening factors, between the deprivation and some injury to plaintiff.").

Plaintiff has failed to establish any constitutional violation related to his outdoor exercise opportunities. First, he admittedly was restricted in his outdoor exercise because he was on disciplinary lockdown for numerous violations of prison rules. Maintenance of prison discipline and security is a legitimate function of prison officials, who must be accorded broad discretion in that function. <u>See</u> <u>Waganfeald v. Gusman</u>, 674 F.3d 475, 485 (5th Cir. 2012), <u>petition for cert. filed</u>, 81 U.S.L.W. 3064 (U.S. July 18, 2012) (No.

12-85) (citing <u>Whitley v. Albers</u>, 475 U.S. 312, 322 (1986); <u>Bell v. Wolfish</u>, 441 U.S. 520, 546, 547 (1979)) ("[S]ecurity considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.") (quotation omitted); <u>Nubine v. Stringfellow</u>, 240 F.3d 1074, 2000 WL 1835288, at *1 (5th Cir. Nov. 28, 2000) (use of shackles during transport was "a rational security measure"); <u>Jackson v. Cain</u>, 864 F.2d 1235, 1243-44 (5th Cir. 1989) ("use of handcuffs or other restraining devices constituted a rational security measure and cannot be considered cruel and unusual punishment unless great discomfort is occasioned deliberately as punishment or mindlessly, with indifference to the prisoner's humanity") (quotation and citation omitted).

Kron's own testimony establishes that he was given time for outdoor exercise, although he was restrained for security reasons, and that the decision of prison officials to restrict his outdoor recreation was a reasonable exercise of their discretion. <u>See</u> <u>Gates v. Cook</u>, 376 F.3d 323, 344 (5th Cir. 2004) (Evidence showed that prisoners' shoes were replaced with flip-flops during exercise time because inmates otherwise used the shoes to kick other inmates and to throw at prison staff, and because flip-flops made escape more difficult. Although plaintiff argued that "the flip-flops make it difficult or

impossible to exercise vigorously[,] . . . there is no support for the proposition that exercising in flip-flops constitutes cruel and unusual punishment."); Montgomery v. Puckett, 8 F.3d 20, 1993 WL 455545, at *2 (5th Cir. 1993) (prisoner's claims did not rise to the level of constitutional violations when he declined to take advantage of exercise time or access to the law library because he objected to being shackled upon leaving his cell to go to the yard or library); Tyson v. LeBlanc, No. 10-1174, 2010 WL 5375955, at *17-18 (E.D. La. Nov. 19, 2010), report & recommendation adopted, 2010 WL 5376330 (E.D. La. Dec. 15, 2010), aff'd, 431 F. App'x 371 (5th Cir. 2011) (requirement that plaintiff remain shackled during outdoor exercise because of his disciplinary status as a recalcitrant offender fails to establish a constitutional violation).

Second, Kron has not presented any evidence that the restriction on his outdoor exercise caused any serious health hazard. His medical records reflect no such deleterious health effect. Kron merely speculates that he would have benefitted from more fresh air and unrestrained outdoor exercise. This speculation is insufficient to establish either a substantial risk of serious harm or any actual injury. See Haralson v. Campuzano, 356 F. App'x 692, 697 (5th Cir. 2009) (inmate who was denied out-of-cell exercise for seven months while in the prison infirmary failed to raise a genuine issue of material fact as to whether he suffered a serious injury sufficient to constitute an Eighth Amendment violation); Hernandez v. Velasquez, 522 F.3d 556, 561 (5th Cir. 2008)

(Assuming the evidence created a fact issue whether plaintiff suffered from muscle atrophy, stiffness, loss of range of motion, and depression as a result of lack of out-of-cell exercise for 13 months, "there is nonetheless no indication these conditions posed a substantial risk of serious harm. The district court properly concluded there was no genuine issue as to whether Hernandez suffered a 'serious illness or injury' sufficient to constitute an Eighth Amendment violation."); Doolittle, 2010 WL 22552, at *6 ("[A]lthough the plaintiff alleged in his Complaint that he suffered muscle atrophy as a result of his confinement for 2 1/2 months without exercise, there is no evidence to support this conclusory assertion. The plaintiff has provided nothing to support his claim of muscle atrophy or to show its extent or duration," and his medical records revealed no complaints about muscle atrophy during the relevant time period.).

Plaintiff has not established that the restriction on his outdoors recreation for legitimate disciplinary and security reasons caused any physical injury or violation of his constitutional rights of any kind as a result of his alleged lack of outdoor exercise. This claim must be dismissed.

For the same reasons, Kron's pending motion to amend his complaint to add a claim that defendant Greta Smith also violated his constitutional rights when she participated in the denial of outdoors recreation, Record Doc. No. 54, must be DENIED. An amendment to a complaint is permissible under Fed. R. Civ. P. 15(a) only if it is not

"futile." <u>Stripling v. Jordan Prod. Co.</u>, 234 F.3d 863, 872 (5th Cir. 2000) (citing <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962); <u>Leffall v. Dallas Indep. Sch. Dist.</u>, 28 F.3d 521, 524 (5th Cir. 1994); <u>Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S. Am. Co.</u>, 195 F.3d 765, 770 (5th Cir. 1999); <u>Wimm v. Jack Eckerd Corp.</u>, 3 F.3d 137, 139 (5th Cir. 1993). Futility in this context means "that the amended complaint would fail to state a claim upon which relief could be granted. . . . [Thus,] to determine futility, we will apply the same standard of legal sufficiency as applies under Rule 12(b)(6)." <u>Stripling</u>, 234 F.3d at 873 (quotations and citations omitted); <u>accord</u> <u>Fenghui Fan v. Brewer</u>, 377 F. App'x 366, 367 (5th Cir. 2010). "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.' 'Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" <u>In Re Katrina Canal Breaches Litig.</u>, 495 F.3d 191, 205 (5th Cir. 2007) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 547 (2007)) (footnote omitted).

For all of the reasons discussed above, permitting Kron to amend his complaint to assert this claim against Smith would be futile. His motion to amend is therefore DENIED.

## VII.   FALSE AND INADEQUATE DISCIPLINARY CHARGES AND PROCEEDINGS

Kron's claims that his constitutional rights were violated based on false or fabricated disciplinary charges and inadequate disciplinary proceedings fail to state a claim of violation of his constitutional rights and must be dismissed.

In <u>Sandin v. Connor</u>, 515 U.S. 472, 481-83 (1995), the United States Supreme Court held that analysis of a prisoner's due process claim relating to his placement in lockdown or other denial of prison privileges as disciplinary punishment begins with determining whether a constitutionally protected liberty interest exists. "Liberty interests protected by the Fourteenth Amendment may arise from two sources–the Due Process Clause itself and the laws of the States." <u>Hewitt v. Helms</u>, 459 U.S. 460, 466 (1983). In <u>Sandin</u>, the Supreme Court recognized that, although the States may create liberty interests, "these interests will generally be limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Sandin</u>, 515 U.S. at 484 (citations omitted). Thus, in <u>Sandin</u>, when a prisoner was placed in disciplinary segregation for 30 days and the placement did not inevitably affect the duration of his sentence, the Court held that due process does <u>not</u> require that a prisoner be afforded the procedural mechanisms previously prescribed in <u>Wolff v. McDonnell</u>, 418 U.S. 539 (1974), and <u>Hewitt</u>, 459 U.S. at 460.

"[T]he Due Process Clause does not protect every change in conditions of confinement which has a substantial adverse effect upon a prisoner." Madison v. Parker, 104 F.3d 765, 767 (5th Cir. 1997). "Prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." Wilkinson v. Austin, 545 U.S. 209, 225 (2005) (citations omitted). The Fifth Circuit held in Madison that a prisoner's 30-day commissary and cell restrictions imposed as punishment for disciplinary violations were "merely changes in the conditions of his confinement and do not implicate due process concerns." Madison, 104 F.3d at 768; accord Hernandez v. Velasquez, 522 F.3d 556, 563 (5th Cir. 2008); Dixon v. Hastings, 117 F. App'x 371, 372 (5th Cir. 2005); Malchi v. Thaler, 211 F.3d 953, 957-58 (5th Cir. 2000). In Hernandez and Madison, the Fifth Circuit held that such restrictions do not represent the type of atypical, significant deprivation in which a state might create a liberty interest. Hernandez, 522 F.3d at 563; Madison, 104 F.3d at 768.

Examples of prison hardships that would qualify as so atypical and significant as to implicate due process considerations include unwanted administration of anti-psychotic drugs, involuntary commitment to a mental hospital or extension of the prisoner's sentence for his underlying criminal conviction. Sandin, 515 U.S. at 484.

In the instant case, Kron's testimony and his written submissions establish that the action taken against him based upon the allegedly false disciplinary charges and inadequate disciplinary hearings were his reassignment to disciplinary segregation or lockdown, loss of sheets, blankets, four weeks of outdoors recreation and a mattress, and payment of restitution. None of these actions constitute such an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" that particular forms of process of the type described in Wolff were required. Sandin, 515 U.S. at 484; Madison, 104 F.3d at 768; see Johnson v. Livingston, 360 F. App'x 531, 532 (5th Cir. 2010) (citing Malchi v. Thaler, 211 F.3d 953, 958 (5th Cir. 2000)) ("Loss of privileges and cell restriction do not implicate due process concerns."); Hernandez, 522 F.3d at 563 (distinguishing the "extreme conditions" described in Wilkinson and holding that non-disciplinary "confinement to a shared cell for twelve months with permission to leave only for showers, medical appointments and family visits . . . is by no means an atypical prison experience"); Dixon, 117 F. App'x at 372 ("loss of commissary privileges, cell restriction, placement in administrative segregation, and extended work schedule were not atypical punishments requiring due process protections"); Payne v. Dretke, 80 F. App'x 314, 314 (5th Cir. 2003) ("commissary and recreation restrictions [as disciplinary punishment] . . . do not implicate a liberty interest under the Due Process Clause").

As discussed above, inmates have no protected liberty interest in specific recreational opportunities and the "[d]eprivation of exercise is not a per se constitutional violation." Lewis, 2001 WL 1485821, at *1 (citing Stewart, 669 F.2d at 336 n.19); Miller, 563 F.2d at 751 n.12); accord Sampson, 2009 WL 837640, at *16 (citing Smith, 945 F.2d at 1043; Beck, 842 F.2d at 762; Lato, 773 F. Supp. at 978).

Even if some process might be required for these sorts of prison disciplinary penalties, it is clear that Kron received sufficient procedural rights under Sandin. He was given a written statement notifying him of the charge against him. He received a hearing before the disciplinary board. He was provided with an opportunity to make a statement on his own behalf.

In addition, the case law is clear that an inmate's allegation that a prison official asserted false disciplinary charges against him fails to state a claim under Section 1983 when the prisoner is afforded due process protection through a subsequent hearing. Harris v. Smith, No. 11-30928, 2012 WL 4328236, at *2 (5th Cir. Sept. 21, 2012) (quoting Collins v. King, 743 F.2d 248, 253-54 (5th Cir. 1984)); accord Doolittle v. Holmes, 306 F. App'x 133, 134 (5th Cir. 2009); Moore v. Butler, 211 F.3d 593, 2000 WL 329165, at *1 (5th Cir. Mar. 17, 2000); Landor v. Lamartiniere, No. 12-103-BAJ-SCR, 2012 WL 3777157, at *7 (M.D. La. Aug. 1, 2012), report & recommendation

adopted, 2012 WL 3777149 (M.D. La. Aug. 29, 2012); Price v. Quarterman, No. 5:09cv153, 2010 WL 715536, at *4 (E.D. Tex. Feb. 23, 2010).

In the instant case, Kron does not dispute that he had disciplinary hearings each time. He alleges that the disciplinary proceedings he received at Rayburn were inadequate because he was not permitted to call witnesses whose testimony he requested. However, his testimony establishes that the hearings were adequate under Sandin in light of the penalties he received. Thus, Kron fails to state a claim that his due process rights were violated because of allegedly false disciplinary charges. No constitutional violation has been stated in this case concerning Kron's disciplinary charges or proceedings, which were adequate under Sandin.

VIII.    ACCESS TO ARP / FIRST AMENDMENT ACCESS TO COURTS

As to his final claim, Kron alleged that defendant Kelly violated his First Amendment rights when she attempted to cover up the other officers' use of excessive force by not allowing Kron to file ARP grievances regarding the use of excessive force. He said that Kelly denied him access to the courts by refusing to allow him to file his ARP grievances appropriately. In his second amended complaint, Kron claimed that Kelly rejected some of his ARP complaints because "they were repetitive" to another ARP grievance. Record Doc. No. 37 at 4, ¶ 16. Although Kron voluntarily dismissed all claims against defendant Kelly, Record Doc. No. 53, he also alleges that various

defendants, including Harrell and Mizell, failed adequately to investigate his grievances. This complaint fails entirely to state a claim for relief under Section 1983.

The Fifth Circuit has held that an inmate "does not have a federally protected liberty interest in having . . . grievances resolved to his satisfaction. As he relies on a legally nonexistent interest, any alleged due process violation arising from the alleged failure to investigate his grievances is indisputably meritless." Geiger v. Jowers, 404 F.3d 371, 374-75 (5th Cir. 2005) (citing Sandin, 515 U.S. at 484; Orellana v. Kyle, 65 F.3d 29, 31-32 (5th Cir. 1995)); accord Bell v. Woods, 382 F. App'x 391, 392 (5th Cir. 2010); Johnson, 360 F. App'x at 532. "Additionally, [plaintiff] could not show any injury from the failure [adequately] to consider his grievances because the alleged [actions of jail officials of which] he complained . . . in the grievances did not implicate his constitutional rights." Bell, 382 F. App'x at 392.

In this case, Kron commenced the prison's ARP by filing grievances on numerous occasions concerning his claims arising from the March 4 and 27, 2010 incidents. In the constitutional sense, an ARP, at most, may be viewed as a means of effectuating plaintiff's First Amendment right to petition the government for redress of grievances. In this instance, plaintiff's grievances were received and processed through the ARP, although the ARP did not end with the results that he wanted. The Fifth Circuit has held that allegations that a prison official has failed adequately to follow particular prison

rules, regulations or procedures, such as an ARP, cannot support a Section 1983 claim, without an independent constitutional violation. <u>McFaul v. Valenzuela</u>, 684 F.3d 564, 579 (5th Cir. 2012) (citing <u>Dist. Attorney's Ofc. v. Osborne</u>, 557 U.S. 52, 67 (2009); <u>Jackson</u>, 864 F.2d at 1251-52; <u>Neuwirth v. La. State Bd. of Dentistry</u>, 845 F.2d 553, 557 (5th Cir. 1988)); <u>Patel v. Haro</u>, 470 F. App'x 240, 244 (5th Cir. 2012); <u>Stanley v. Foster</u>, 464 F.3d 565 (5th Cir. 2006). "The failure of the prison to follow its own policies, including a failure to address prisoner grievances, is not sufficient to make out a civil rights claim." <u>Richardson v. Thornton</u>, 299 F. App'x 461, 463 (5th Cir. 2008) (citing <u>Myers v. Klevenhagen</u>, 97 F.3d 91, 94 (5th Cir. 1996)).

In this case, it cannot be concluded that Kron was denied access to the courts in violation of the First Amendment based on his allegations that some of his ARP complaints were rejected because "they were repetitive" to another ARP grievance. Prisoners have a First Amendment right of meaningful access to the courts. <u>Bounds v. Smith</u>, 430 U.S. 817, 828 (1977); <u>Dickinson v. TX, Fort Bend County</u>, 325 F. App'x 389, 390 (5th Cir. 2009); <u>Sandoval v. Johns</u>, 264 F.3d 1142, 2001 WL 822779, at *1 (5th Cir. 2001); <u>McDonald v. Steward</u>, 132 F.3d 225, 230 (5th Cir. 1998); <u>Degrate v. Godwin</u>, 84 F.3d 768, 768-69 (5th Cir. 1996). However, this constitutional right is not without limitations. "While the precise contours of a prisoner's right of access to the courts remain somewhat obscure, the Supreme Court has <u>not</u> extended this right to encompass

more than <u>the ability of an inmate to prepare and transmit a necessary legal document to a court</u>." <u>Vaccaro v. United States</u>, 125 F.3d 852, 1997 WL 574977, at *1 (5th Cir. 1997) (quotation omitted) (emphasis added); <u>accord</u> <u>Norton v. Dimazana</u>, 122 F.3d 286, 290 (5th Cir. 1997); <u>Eason v. Thaler</u>, 73 F.3d 1322, 1328 (5th Cir. 1996).  Significantly, a prisoner's First Amendment right in this regard is limited to the presentation of a <u>non</u>-frivolous claim or argument to the court.  <u>Lewis v. Casey</u>, 518 U.S. 343, 352-53 (1996).

In addition, to state a claim that his constitutional right of access to the courts was violated, Kron must demonstrate that his position as a litigant was actually prejudiced. <u>Id.</u> at 356; <u>Cochran v. Baldwin</u>, 196 F. App'x 256, 257-58 (5th Cir. 2006); <u>Smith v. Polunsky</u>, 233 F.3d 575, 2000 WL 1468717, at *1 (5th Cir. 2000); <u>Eason</u>, 73 F.3d at 1328.

Kron wholly fails to establish the essential elements of a First Amendment claim detailed above, either in his complaint or his testimony.  His testimony establishes that he has been provided with and has in fact had the ability to prepare and transmit legal documents to the courts, including his complaints and voluminous additional submissions in this case.  In addition, no actual prejudice to his position as a litigant has occurred.  The court has received and fully considered all of plaintiff's submissions.  His claims have been the subject of this court's full evaluation, and his <u>non</u>-frivolous claims

will be the subject of further proceedings. Kron has neither alleged nor shown any actual injury to his position as a litigant in these matters.

For all of the foregoing reasons, Kron's claims concerning his ARP submissions and the First Amendment are legally frivolous and fail to state a claim upon which relief can be granted under Section 1983. They must be dismissed.

## RECOMMENDATION

For all of the foregoing reasons, it is **RECOMMENDED** that plaintiff's complaint be **DISMISSED WITH PREJUDICE IN PART** as legally frivolous and/or for failure to state a claim under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1), but that further proceedings be conducted as to his remaining claims against six (6) defendants.

If this recommendation is accepted, all claims against all defendants will be dismissed, EXCEPT for the following claims against the below-listed defendants, which require further proceedings:

(1)     Section 1983 excessive force and related state law tort claims against defendants David Alford and Steve Price concerning the March 27, 2010 incident; and

(2)     Section 1983 failure to protect and related state law tort claims against defendants Greta Smith, Mike Todd and Elizabeth Olivierra for the March 4, 2010 incident and against defendant Mike Weary for the March 27, 2010 incident.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[6]

New Orleans, Louisiana, this ____1st____ day of October, 2012.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[6]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.